1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11  QUECHAN TRIBE OF THE FORT YUMA
    INDIAN RESERVATION, a federally
12  recognized Indian Tribe,

    CASE NO. 10cv2241-LAB (CAB)

    **ORDER GRANTING**
    **PRELIMINARY INJUNCTION**

13                                    Plaintiff,

14        vs.

    UNITED STATES DEPARTMENT OF
15  THE INTERIOR, et al.,

16                                    Defendants.

17

18        On October 29, 2010, Plaintiff (the "Tribe") filed its complaint, alleging Defendants'

19  decision to approve a solar energy project violated various provisions of federal law.  On

20  November 12, the Tribe filed a motion for preliminary injunction, asking the Court to issue

21  an order to preserve the status quo by enjoining proceeding with the project, pending the

22  outcome of this litigation.  After the motion was filed, Imperial Valley Solar LLC intervened

23  as a Defendant.

24        On Monday, December 13, the Court held a oral argument at which the parties

25  appeared through counsel.  After the parties were fully heard, the Court took the matter

26  under submission, with the intent to rule within two days.

27  / / /

28  / / /

**Background**

The Quechan Tribe is a federally-recognized Indian tribe whose reservation is located mostly in Imperial County, California and partly in Arizona.  A large solar energy project is planned on 6500 acres of federally-owned land known as the California Desert Conservation Area ("CDCA").  The Department of the Interior, as directed by Congress, developed a binding management plan for this area.

The project is being managed by a company called Tessera Solar, LLC.[1]  Tessera plans to install about 30,000 individual "suncatcher" solar collectors, expected to generate 709 megawatts when completed.  The suncatchers will be about 40 feet high and 38 feet wide, and attached to pedestals about 18 feet high.  Support buildings, roads, a pipeline, and a power line to support and service the network of collectors are also planned.  Most of the project will be built on public lands.  Tessera submitted an application to the state of California to develop the Imperial Valley Solar project.  The project is planned in phases.

After communications among BLM, various agencies, the Tribe, and other Indian tribes, a series of agreements, decisions, and other documents was published. The final EIS was issued some time in July, 2010.[2]  At the same time, a Proposed Resource Management Plan - Amendment, amending the Department of the interior's CDCA was also published. On September 14 and 15, certain federal and state officials, including BLM's field manager, executed a programmatic agreement (the "Programmatic Agreement") for management of the project.[3]  The Tribe objected to this.  On October 4, 2010, Director of the Bureau of Land Management Robert Abbey signed the Imperial Valley Record of Decision ("ROD")

---

[1] Although the two entities are obviously related, the briefing doesn't explain the relationship between Tessera and Imperial Valley Solar, except to say that Tessera applied to develop the Imperial Valley Solar project.

[2] The final EIS, included as an exhibit to the Tribe's motion, includes the BLM's field manager's signature, the month and year, but no date.  It was published in the July 28, 2010 Federal Register.

[3] This is included in the lodged partial administrative record, at PI 007347–007372. While the table of contents refers to "invited signatory parties" and "concurring parties," and lists various appendices, the Programmatic Agreement is cut off immediately after the signatures of federal and state officials.

1   approving the project, and the next day Secretary of the Interior Ken Salazar signed the
2   ROD.  The ROD notice was published on October 13, 2010.

3       The area where the project would be located has a history of extensive use by Native
4   American groups.  The parties agree 459 cultural resources have been identified within the
5   project area.  These include over 300 locations of prehistoric use or settlement, and ancient
6   trails that traverse the site.  The tribes in this area cremated their dead and buried the
7   remains, so the area also appears to contain archaeological sites and human remains.  The
8   draft environmental impact statement ("EIS") prepared by the BLM indicated the project "may
9   wholly or partially destroy all archaeological sites on the surface of the project area."

10      The Tribe believes the project would destroy hundreds of their ancient cultural sites
11  including burial sites, religious sites, ancient trails, and probably buried artifacts.
12  Secondarily, it argues the project would endanger the habitat of the flat-tailed horned lizard,
13  which is under consideration for listing under the Endangered Species Act and which is
14  culturally important to the Tribe.  The Tribe maintains Defendants were required to comply
15  with the National Environmental Policy Act (NEPA), the National Historical Preservation Act
16  (NHPA), and the Federal Land Policy and Management Act of 1976 (FLPMA) by making
17  certain analyses and taking certain factors into account deciding to go ahead with the
18  project.  The Tribe now seeks judicial intervention under the Administrative Procedures Act
19  (APA).

20  **Legal Standards**

21      **APA**

22      The Court's review of agency action under NEPA, NHPA, or FLPMA is governed by
23  the Administrative Procedures act.  Under 5 U.S.C. § 706 the Court is directed to compel
24  agency action that has been unlawfully withheld, (§ 706(1)), and hold unlawful and aside
25  agency actions it  finds to be "arbitrary, capricious, abuse of discretion, or otherwise not in
26  accordance with law" (§ 706(2)(A)), or "without observance of procedure required by law"
27  ((§ 706(2)(D)).  The burden is on the Tribe to show any decision or action was arbitrary and
28  capricious.  *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

**Preliminary Injunctive Relief**

The four-factor test for issuance of injunctive relief is set forth in *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

Even after *Winter*, the Court may also use a "sliding scale" approach. As explained in *Alliance for Wild Rockies v. Cottrell*, F.3d 1045, 1049–50 (9th Cir. 2010), "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."

Here, the merits question is the most complex, and was the primary focus of briefing and argument. The Court considers this question first.

**Merits Discussion**

The parties agree that, under NHPA Section 106 (16 U.S.C. § 470f) and its implementing regulations, the Bureau of Land Management (BLM) is required to consult with certain parties before spending money on or approving any federally-assisted undertaking such as the project at issue here, and that the Tribe is one of those parties. The Tribe maintains BLM didn't adequately or meaningfully consult with them, but instead approved the project before completing the required consultation. According to the Tribe, BLM simply didn't consider what the tribe had to say before approving the project.

The Court finds this to be the strongest basis for issuance of injunctive relief and therefore focuses on it.

**NHPA Consultation Requirements**

The NHPA's purpose is to preserve historic resources, and early consultation with tribes is encouraged "to ensure that all types of historic properties and all public interests in such properties are given due consideration . . . ." *Te-Moak Tribe v. U.S. Dept. of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (quoting 16 U.S.C. § 470a(d)(1)(A)). The consultation

process is governed by 36 C.F.R. § 800.2(c)(2), one of Section 106's implementing regulations. Under this regulation, "[c]onsultation should commence early in the planning process, in order to identify and discuss relevant preservation issues . . . ." § 800.2(c)(2)(ii)(A). The Ninth Circuit has emphasized that the timing of required review processes can affect the outcome and is to be discouraged. *Id*. (citing *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 787, 785–86 (9th Cir. 2006). The consultation requirement is not an empty formality; rather, it "must recognize the government-to-government relationship between the Federal Government and Indian tribes" and is to be "conducted in a manner sensitive to the concerns and needs of the Indian tribe." § 800.2(c)(2)(ii)(C). A tribe may, if it wishes, designate representatives for the consultation. *Id*.

The Section 106 process is described in 36 C.F.R. §§ 800.2–800.6. After preliminary identification of the project and consulting parties, Section 106 requires identifying historic properties within a project's affected area, evaluating the project's potential effects on those properties, and resolving any adverse effects. The Tribe insists this consultation must be completed at least for Phase 1 of the project, before construction begins.

Throughout this process, the regulations require the agency to consult extensively with Indian tribes that fall within the definition of "consulting party," including here the Quechan Tribe.[4] Section 800.4 alone requires at least seven issues about which the Tribe, as a consulting party, is entitled to be consulted before the project was approved. Under § 800.4(a)(3), BLM is required to consult with the Tribe identify issues relating to the project's potential effects on historic properties. Under § 800.4(a)(4), BLM is required to gather information from the Tribe to assist in identifying properties which may be of religious and cultural significance to it. Under § 800.4(b), BLM is required to consult with the Tribe to take steps necessary to identify historic properties within the area of potential effects. Under § 800.4(b)(1), BLM's official is required to take into account any confidentiality concerns raised by tribes during the identification process. Under § 800.4(c)(1), BLM must consult

---

[4] The Tribe is a consulting party because it attaches religious and cultural significance to the historic properties that may be affected by the project. The fact that the properties are not on the Tribe's own land doesn't affect this status. 36 C.F.R. § 800.2(c)(2)(ii).

with the Tribe to apply National Register criteria to properties within the identified area, if they have not yet been evaluated for eligibility for listing in the National Register of Historic Places.   Under § 800.4(c)(2), if the Tribe doesn't agree with the BLM's determination regarding National Register eligibility, it is entitled to ask for a determination.   And under § 800.4(d)(1) and (2), if BLM determines no historic properties will be affected, it must give the Tribe a report and invite the Tribe to provide its views.   Sections 800.5 and 800.6 require further consultation and review to resolve adverse effects and to deal with failure to resolve adverse effects.

Furthermore, under § 800.2, consulting parties that are Indian tribes are entitled to special consideration in the course of an agency's fulfillment of its consultation obligations. This is spelled out in extensive detail in § 800.2(c).   Among other things, that section sets forth the following requirements:

> (A) The agency official shall ensure that consultation in the section 106 process provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects. . . . **Consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties**.

> (B) The Federal Government has a unique legal relationship with Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions. **Consultation with Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty. . . .**

> (C) **Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government . . . . Consultation with Indian tribes . . . should be conducted in a manner sensitive to the concerns and needs of the Indian tribe . . . .**

> (D) When Indian tribes . . . attach religious and cultural significance to historic properties off tribal lands, section 101(d)(6)(B) of the act requires Federal agencies to consult with such Indian tribes. . . in the section 106 process. **Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes . . . and should consider that when complying with the procedures in this part**.

1    36 C.F.R. § 800.2(c)(2)(ii)(A)–(D) (emphasis added).  The Tribe points out the significance

2    of the "confidentiality" provisions, citing *Pueblo of Sandia v. United States*, 50 F.3d 856,

3    861–62 (10th Cir. 1995) (noting that pueblo's reticence to share information about cultural

4    and religious sites with outsiders was to be expected, and that federal government knew

5    tribes would typically not answer general requests for information).

6        The Ninth Circuit has emphasized that federal agencies owe a fiduciary duty to all

7    Indian tribes, and that at a minimum this means agencies must comply with general

8    regulations and statutes.  *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir.

9    2006).  *See also* 36 C.F.R. § 800.2(c)(2)(ii)(B) (mentioning the "unique legal relationship"

10    between federal government and Indian tribes).  Violation of this fiduciary duty to comply with

11    NHPA and NEPA requirements during the process of reviewing and approving projects

12    vitiates the validity of that approval and may require that it be set aside.  *Id*.

13        Defendants, citing 36 C.F.R. § 800.14(b)(1)(ii), argue that "the execution of a

14    Programmatic Agreement completes the Section 106 process" (Opp'n to Mot. for Prelim.

15    Inj., 22:11–17) and is an acceptable way to resolve adverse effects from complex projects

16    "[w]hen effects on historic properties cannot be fully determined prior to approval of an

17    undertaking." (*Id*. at 9:10–11.)  But this is true only if "executing" means "carrying out;"

18    merely entering into a programmatic agreement does not satisfy Section 106's consultation

19    requirements.  36 C.F.R. § 800.14(b)(2)(iii) ("Compliance with the procedures established

20    by an approved programmatic agreement satisfies the agency's section 106 responsibilities

21    for all individual undertakings of the program covered by the agreement . . . .") The Tribe

22    asks that consultation be completed at least for phase 1 before the project begins.  That

23    Defendants are resisting this suggests they are probably not prepared to do so.

24        The programmatic agreement must be negotiated in accordance with § 800.14(b),

25    which itself requires an extensive consultation process.  § 800.14(f).  The Tribe has also

26    argued a programmatic agreement is not authorized for this type of project.

27        Defendants are correct that under § 800.4(b)(2), identification of historic properties

28    can be deferred if "specifically provided for" in a programmatic agreement negotiated

1  pursuant to § 800.14(b).  But this deferral is not indefinite, and entering into an appropriately-
2  negotiated programmatic agreement does not relieve the BLM of all responsibility.  The
3  second half of § 800.4(b)(2) contemplates consultation on historic properties as it becomes
4  feasible:

> The process should establish the likely presence of historic properties within the area of potential effects for each alternative or inaccessible area through background research, consultation and an appropriate level of field investigation, taking into account the number of alternatives under consideration, the magnitude of the undertaking and its likely effects, and the views of . . . any other consulting parties. As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section.

10  In short, entering into an appropriately-negotiated programmatic agreement can result in
11  deferral of the consulting process, but it would only allow a temporary delay in consultation,
12  until it is feasible to identify and consult with the Tribe about the historic properties.
13  *Compare Te-Moak*, 608 F.3d at 610 (explaining that assessment of impact on environmental
14  resources could be deferred where drilling locations in mineral exploration project could not
15  reasonably be determined at the time of approval, but where plan required assessment as
16  drilling locations became known).

17        **Communications and Documentary Evidence**

18        **The Tribe's Evidence and Arguments**

19        In support of its point that Defendants failed to adequately consult, the Tribe cites its
20  letter to BLM's Field Manager on February 4, 2010, in which it expressed concern that the
21  schedule for issuance of the ROD didn't allow enough time for adequate consultation, and
22  that the required consultation was being inappropriate deferred.  (Somerville Decl. in Supp.
23  of Mot. for Prelim. Inj., Ex. 5 at 273–75.)  This letter says the Tribe had informally learned
24  that a Programmatic Agreement was being developed, which BLM intended to approve by
25  September, 2010.  It also expressed the concern that, if the project were ultimately approved
26  in spite of the presence of cultural resources, the quick schedule wouldn't allow enough time
27  for BLM to consult with the tribe to develop a plan to avoid harming the sites.
28  / / /

By itself, this letter suggests the Tribe was consulted late in the planning process, wasn't being consulted when it wrote the letter, and was concerned about the lack of consultation. It also suggests the time frame for consultation was compressed. The Tribe also cites other later documents, showing that it expressed its dissatisfaction to the Department.

At oral argument, the Tribe admitted BLM engaged in some communication and did some consulting, but described the purported consulting as cursory and inadequate, consisting mostly of informational meetings where the Tribe's opinions were not sought, rather than government-to-government consultation.

**Defendants' Evidence and Arguments**

In response, Defendants provide string citations to materials in the record which they say document "extensive consultation with tribes, including Plaintiff." (Opp'n to Mot. for Prelim. Inj. at 4:18–5:2. This description of the documents is general and cursory, and sheds little light on the degree to which BLM consulted with the Tribe, or whether the consultation was intended to comply with NEPA or NHPA. First, the documentation includes consultations with other tribes, agencies, and with the public. While this other consultation appears to be required and serves other important purposes, it doesn't substitute for the mandatory consultation with the Quechan Tribe. In other words, that BLM did a lot of consulting in general doesn't show that its consultation with the Tribe was adequate under the regulations. Indeed, Defendants' grouping tribes together (referring to consultation with "tribes") is unhelpful: Indian tribes aren't interchangeable, and consultation with one tribe doesn't relieve the BLM of its obligation to consult with any other tribe that may be a consulting party under NHPA. At oral argument, the Court inquired of Defendants about consultation, but they were unable to be any more specific than they were in their briefing.

The partial administrative record was provided to the Court on CD-ROM, with the documents numbered consecutively and also assigned page numbers (preceded by "PI"). To determine whether these documents show BLM properly engaged in NHPA-required consultation with the Tribe, the Court reviewed each of the documents Defendants cite. *See*

Opp'n at 4:18–5:2.  But the Defendants should take note that as a matter of practice, it is incumbent on them to explain the significance of exhibits they cite, rather than just citing them with the expectation that the Court will sift through them.

Furthermore, a significant number of the cited exhibits are duplicates or inapt.  By failing to weed out marginal, needless, or duplicate citations, Defendants create the impression they are padding the record—perhaps because the evidence doesn't favor them.

A final quibble.  The briefing also mostly cites documents in the order they appear in the record Defendants prepared.  This blurs the chronology, which is obviously a critical factor here.  The documents are separately identified in a few instances, but in most cases only a page range is given.  For purpose of convenience, this order will treat each undifferentiated citation to a page range as a single document, discuss the documents in the order they are cited, and discuss the chronology later.

## Documents Cited to Show Consultation

The first document cited to show consultation (PI 009213–009541) was a log by URS Corporation, a private corporation Imperial Valley Solar, LLC retained to conduct environmental investigation of the proposed project site.  *See* Opp'n at 2:16–18 (identifying URS).  This doesn't constitute NHPA consultation at all.

The second document is an appendix to the ROD identifying "consultation" with various tribes.  The subject matter of the consultation isn't identified, and in some cases the nature of the contact isn't clear.  But this summary is helpful in the sense that it shows the chronology of BLM's consultation with the Tribe.  Some of the listed contacts were with members of the Tribe, but these don't appear to be designated representatives and therefore consultation with them doesn't constitute consultation with the Tribe for NHPA purposes.  Fourteen contacts with the Tribe's president are listed, as follows:

1) A letter from BLM to the Tribe's president on January 8, 2008

2) Another letter from BLM to the Tribe's president on November 11, 2008

3) A follow-up call to the Tribe's president on November 17, 2008

4) A follow-up call to the Tribe's president on December 12, 2008

1    5) A letter from BLM to the Tribe's president on November 6, 2009

2    6) A follow-up call or email from BLM to the Tribe's president sometime from

3         November 21, 2009 to December 1, 2009

4    7) A letter from BLM to the Tribe's president on January 15, 2010

5    8) A response letter from the Tribe to BLM on February 4

6    9) A letter from BLM to the Tribe's president on March 11, 2010

7    10) A letter from BLM to the Tribe's president on March 29, 2010.

8    11) A letter from BLM to the Tribe's president on June 2, 2010

9    12) A letter from BLM to the Tribe's president on June 24, 2010

10   13) A letter in response from the Tribe on August 4, 2010

11   14) A letter from BLM to the Tribe on August 18, 2010.

12   (*Id.*, PI 000379, 000386.)  Many of the documents included in this summary are cited later,

13   and this order discusses them below.

14        As part of this summary, thirty-one contacts with the Tribe's historic preservation

15   officer are also recorded.  (PI 000380, 000386.)  The summary says this officer received the

16   same letters and follow-up calls as did the Tribe's president, and had additional contact with

17   BLM.  There is no showing the Tribe designated her as a contact for NHPA purposes,

18   though this summary counts her reply letters as replies from the Tribe.

19        This summary is significant because it shows BLM's early contact with the Tribe

20   consisted of a letter in January, 2008, a second letter in November, 2008 (and follow-up

21   calls), and a third letter (and follow-up calls) in December, 2009.  The communication

22   apparently began in earnest with the January, 2010 letter, which prompted the Tribe's

23   response letter discussed above.

24        The third cited document is a letter to the Tribe's president and dated September 27,

25   2010.  (PI 007345–007346.)  This letter urges the Tribe to sign the Programmatic

26   Agreement, but doesn't involve NHPA consultation.

27        The fourth cited document is actually two documents compressed together.  First is

28   a letter to the Tribe's president dated September 7, 2010.  (PI 007374–007375.)  It

discusses NEPA consultation, and also invites the Tribe to a public informational meeting to be held September 29, 2010.  It also extends a general invitation: "The BLM would also be glad to meet with your Tribe about the project or the topics of this letter[.]"  The second is a letter to the Tribe's president dated August 18, 2010, responding to a complaint from the Tribe.  It outlines the dates it sent letters in the past, characterizes many of those letters as invitations to consult, and contends the Tribe has been fully heard: "As a result of the tribal consultation efforts for this project, BLM is fully aware of the Quechan Indian Tribe[']s issues and concerns and these are being considered in the decision process."  (PI 007376.)  It also requests an opportunity for an archaeologist on the BLM staff to meet with the tribal council. (PI 007377.)

The fifth cited document is a letter dated August 4, 2010 from the Tribe to Daniel Steward, whom it identifies as the BLM's "project lead."   This letter complains that the consultation and review process is being rushed, and asks the BLM to arrange a time to meet with the tribal council after it has had time to review the reports and maps depicting the historical resources on the site.

The sixth cited document is a letter dated June 24, 2010 from the BLM to the Tribe's president.  It invites consultation, invites the president to archaeological site visits led by "cultural resource consultants" scheduled for the week of July 26, 2010, and provides an update of a report by URS Corporation.[5]   The letter also discusses a past meeting, and without further explanation informs the Tribe that the final Programmatic Agreement must be prepared before the ROD is issued in September, 2010.   The letter acknowledges the Programmatic Agreement has been in preparation since December, 2009 and says all comments on the proposed Programmatic Agreement must be received by June 25, the day after the letter is dated.

/ / /

---

[5] The summary included in the letter says the cultural resources inventory report for the project has been "completed" and is included on a CD sent along with the letter.  The summary says 446 archaeological resources were identified, including 365 archaeological sites and 81 isolated finds.  This section also discusses a change to the project plan made in 2008, to alleviate cultural resource concerns.

The letter invites the Tribe's "assistance in identifying any places to which the Tribe may attach religious or cultural significance which could be affected by the proposed project as well as how the project may affect those places." (PI 008156.) It again invites the Tribe to contact the BLM's archaeologist or "point or contact."

The seventh cited document consists of multiple letters spanning 40 pages. The first is a letter to the Tribe's president dated March 29, 2010. It expresses the desire to "continue our efforts to inform and consult with your Tribe" pursuant to NHPA. It explains roughly where the project will be located, mentions that it may include construction of roads, building, a pipeline, and a transmission line, as well as installation of the solar collectors. The letter refers to a group meeting in December, 2009 at which it discussed the need to prepare the Programmatic Agreement. It informs the Tribe that the project might not be able to avoid all historic properties eligible for listing on the National Register, and asks the Tribe to review and offer its suggestions on the proposed Programmatic Agreement listed as an enclosure. It asks the Tribe to return comments by "May, 2009" [*sic*] and says another draft will be provided for the Tribe's review later. (PI 009656.) Finally, the letter invites the Tribe to participate in a meeting to discuss comments on the draft agreement.

The seventh document's second letter is addressed to the Tribe's president and is dated March 11, 2010. It includes much of the same information as was included in the March 29 letter, but primarily addresses the draft environmental impact statement ("DEIS"). It also invites the Tribe to a workshop and public meeting on the DEIS, and to a conference and hearing by the California Energy Commission. As part of the discussion of the DEIS, the letter represents that it includes preliminary results of the cultural resources studies, "with sufficient detail to identify the potential impacts that the proposed project would have on cultural resources." (PI 009687.) Finally, the letter invites consultation on the Programmatic Agreement, issues a general invitation "to initiate or continue government-to-government consultation for this project pursuant to all relevant laws including Section 106," and again invites the Tribe to call the BLM archaeologist or "point of contact" for information. (PI 009688.)

The seventh document's third letter, addressed to the Tribe's president, is dated January 15, 2010.  This letter informs the Tribe that Tessera Solar has submitted an application for a right-of-way to develop the project.  (This was apparently the Tribe's first notification that an application had been submitted.)  The letter gives the same general description of the proposed project and invites the Tribe to a public informational meeting to follow up on the informational meeting it held in December, 2009.  This letter also gives tentative dates for issuance of certain documents, including the final environmental impact statement. It tells the Tribe "we must have a finalized [Programmatic Agreement] before the Record of Decision is signed on the Solar Two[6] project.  The Record of Decision is planned for September 2010."  (PI. 009689.)

The seventh document's fourth letter is addressed to the Tribe's president and is dated November 6, 2009.  It too makes general mention of the project and informs the Tribe that Tessera Solar has applied for a right-of-way to develop a solar energy facility.  This letter invites the tribe to a "cultural resources information and Programmatic Agreement coordination meeting," and "once again extend[s] an invitation to initiate or continue government-to-government consultation and Section 106 consultation pursuant to the *National Historic Preservation Act* and other applicable laws and regulations."  (PI 009690.) The letter discusses environmental review, then goes on to discuss the requirements imposed by Section 106.  It also gives a general warning:

> As the proposed project may not be able to avoid all historic properties, regulations implementing the *National Historic Preservation Act* require that the lead agency (i.e. BLM) prepare an agreement document in consultation with [certain tribes, agencies, and the public].    The Programmatic Agreement . . . will outline the manner in which the BLM will take into account the effects of the proposed project and conclude its responsibilities under Section 106.

(PI 009691.)   The letter then invites the Tribe to participate in a "cultural resources information meeting and project site tour" on December 4, 2009.  The letter says this meeting "will also provide an opportunity for the Tribe to participate as a consulting party in

---

[6] "Solar Two" is defined in the letter cited next, the November 6, 2009 letter.  It was apparently the working name for the project at issue here.

1    the development of the [Programmatic Agreement]."  This letter includes maps showing the

2    outlines of the project area.

3         The eighth document consists of two letters.  The first is dated November 11, 2008

4    and is addressed to the Tribe's president.  This letter informs the Tribe an application for a

5    right-of-way has been submitted for a solar project, gives general information about the

6    project, and invites the Tribe to a public informational meeting.   Maps and general

7    descriptions of the proposed project are attached.  The second is dated January 8, 2008.

8    It's similar to the November 11 letter, but includes less information.  It invites the Tribe to

9    contact the BLM's two "points of contact."

10        The ninth document consists of six letters from the Tribe's historical preservation

11   officer and president to BLM.  The first is a brief letter from the historic preservation officer

12   dated February 19, 2008 informing BLM the project area is within the Tribe's historic use

13   area, and requesting more information, a survey, and a meeting.  The remaining letters are

14   much more recent, The earliest is dated February 4, 2010.  Like the letters that follow, it

15   raises the Tribe's complaints about the review process.  For example, the letters point to the

16   limited schedule, request additional time, and object that a Programmatic Agreement isn't

17   appropriate or provided for under applicable regulations.  Later letters raise objections to the

18   draft Programmatic Agreement, and insist that the BLM engage in the process outlined in

19   36 C.F.R. § 800.4 *et seq.*  The letters also identify various legal authority the Tribe believes

20   BLM is disobeying or undermining, and ask BLM to provide them with information about the

21   project so they can review it before the BLM-imposed deadlines pass.  The remaining letters

22   are specific in their objections.   The final letter in this series, dated August 4, 2010,

23   complained that although the Tribe requested a copy of the cultural report in 2008, BLM only

24   provided a copy in early July, 2010.  The letter asks BLM to arrange a time to meet with the

25   tribal council on the reservation, and says the required Section 106 consultation can't begin

26   until the Tribe has time to review the report.

27   / / /

28   / / /

**Supplemental String Citations**

After this, Defendants say "BLM's consultation with Plaintiff, in which URS assisted, included many letters, meetings (both with Plaintiff alone and including one or more other tribes), site visits and telephone conversations. Their brief provides a string cite to 32 separate page ranges without individual explanation. Many of the references are either repetitions of the earlier citations, or duplicates of those documents. The Court will discuss those documents below, but only the ones that are not repeat citations or duplicates.

The first non-duplicate supplemental citation (PI 009261) is a letter from URS to the Tribe's president, dated February 28, 2008, providing a map and requesting information about cultural resources that might be affected by the project.

The second (PI 009265) is a similar letter someone named Preston Arrow-weed but otherwise unidentified.

The third (PI 009273) is a letter from the Tribe's historic preservation officer, dated March 17, 2008, re-forwarding her letter of February 19th, 2008.

The fourth (PI 009327) is a letter from Preston Arrow-weed, who apparently is a member of the Tribe, to the Imperial County Board of Supervisors.

The fifth (PI 009476–009482) is a letter from the Tribe's historic preservation officer to the BLM's archaeologist, dated May 4, 2010 and objecting that the draft Programmatic Agreement is inconsistent with Section 106's consulting requirements. This letter also objects that the consultation up to that point has been inadequate and cites portions of Section 106 and its regulations the Tribe believes BLM has been failing to comply with. Finally, the letter includes specific comments on the draft Programmatic Agreement. This letter repeats many of the complaints raised in the other letters.

The sixth (PI 009508–009509) is a letter from BLM to the Tribe's president, dated June 2, 2010, inviting the Tribe to a general informational meeting. The revised Programmatic Agreement is listed as an enclosure, and the letter solicits comments on it. PI 009526–009527 is a letter from the Tribe's historic preservation officer to BLM's "point of contact," dated June 4, 2010. The letter says the officer attended an update meeting the day

before where she was told the cultural report for the project had not yet been completed. The letter complains that it is impossible for the Tribe to consult on cultural resources issues until it has been provided with basic information about what cultural resources the project might affect.   The letter also reiterates the officer's request for a map showing where the cultural resources are located, and complains that the points out the number of cultural resources has fluctuated repeatedly.  For example, the letter says the Tribe was told on May 25 there were 361 cultural resources in the project area, but the latest count (as of June 4) was 442.  The letter asks BLM to revise the timeline to allow for adequate consultation and review.

The seventh (PI 009528–009533) is a letter from the Tribe's historic preservation officer to BLM's archaeologist, dated June 14, 2010, objecting to various points in the draft Programmatic Agreement.

The eighth (PI 010249–1010251) is a meeting summary for a group presentation to attendees from several tribes on September 29, 2010.  Lorey Cachora, a member of the Tribe, is shown in attendance but no representatives from the Tribe's government.  The minutes of the meeting show that the Programmatic Agreement had been signed by federal agencies and would be forwarded to tribes for their signatures, with the explanation that the tribes' assent would mean nothing more than that they wished to be consulted about the project.

The ninth (PI 010290–10293) is notes from a site visit on July 29 through 31, 2010. A person from the Tribe, Manfred Scott, was in attendance on July 29 but his role is not otherwise explained.  The notes also show Preston Arrow-weed attended the visit on both the 29th and 30th, and was shown a map of all cultural sites along an ancient shoreline he inquired about.

The tenth (PI 010294–010312) is notes from a meeting on June 16, 2010.  Several members of the Tribe and its historic preservation officer are shown as attending either in person or telephonically.   The notes show tribal members complaining about inadequate / / /

notice of the meeting, the approval process being rushed, and the lack of a report.  The notes also show discussion of some sites and archaeological finds.

The eleventh (PI 010313–010320) is notes from a meeting on May 18, 2010, at which the Tribe's historic preservation officer appeared telephonically.  The meeting concerned drafting of the Programmatic Agreement.

The twelfth (PI 010321–010328) is notes from a meeting on May 4, 2010 at which the Tribe's historic preservation officer and two members of the Tribe appeared.  This meeting appears to be a status update, and focuses on the development of the Programmatic Agreement.  The notes show the cultural resources inventory hadn't been completed.  Historical resources were discussed to some extent, and the number was set at 350.  Some specifics about the projects and impact mitigation were discussed.  Attendees also objected that they didn't have a map of the site, and complained that the informational meetings being held weren't consultation as required under Section 106.

The thirteenth (PI 010329–010337) is an agenda, sign-in sheet, and notes from a general meeting on December 4, 2009 at which several members of the Tribe attended.  The record doesn't show any official representative of the Tribe attended.

The fourteenth (PI 010338–010340) is photocopied notes on a steno pad.  The import of this is unclear but it seems to concern a meeting in August, 2008 with the Tribe's historic preservation officer.

The fifteenth (PI 010341–010342) is more photocopied notes on a steno pad, dated in July, 2009.  Apparently it concerns some kind of meeting with members of the Tribe.  Finally, Defendants cite to paragraphs 6 through 10 of the declaration of Rebecca Apple in support of their opposition.  This portion of her declaration attests to her preparation of certain reports, and meetings and visits with members of tribes generally  Ms. Apple's only recorded meeting with designated representatives of the Tribe occurred on October 16, 2010.

/ / /

/ / /

### Analysis of Documentary Evidence

Preliminarily, several points bear noting.  First, the sheer volume of documents is not meaningful.  The number of letters, reports, meetings, etc. and the size of the various documents doesn't in itself show the NHPA-required consultation occurred.

Second, the BLM's communications are replete with recitals of law (including Section 106), professions of good intent, and solicitations to consult with the Tribe.  But mere *pro forma* recitals do not, by themselves, show BLM actually complied with the law. As discussed below, documentation that might support a finding that true government-to-government consultation occurred is painfully thin.

At oral argument, the Tribe described the meetings as cursory information sessions and the reports and other communications as inadequate.  Its briefing also argues that Defendants have confused "contact" with required "consultation."  Defendants In response, Defendants argue that the Tribe "has been invited to government-to-government consultations since 2008" "BLM began informing the Tribe of proposed renewable energy projects within the California Desert District as early as 2007," and "[s]ince that time BLM has regularly updated the Tribe on the status of the [Imperial Valley Solar] project."  (Opp'n, 5:26-6:3.)

The Tribe's first document contact with BLM was the tribal historical preservation officer's letter of February 19, 2008.  That letter put BLM on notice that the historical and cultural sites within the project area would be considered important to the Tribe.  It also asked BLM to provide a survey of the area and to meet with the Tribe's government, which would have constituted government-to-government consultation.  BLM could not have provided the survey at that time, and apparently also didn't comply with the meeting request, because the historic preservation officer re-sent the letter the next month.  In fact, the documentary evidence doesn't show BLM ever met with the Tribe's government until October 16, 2010, well after the project was approved.  All available evidence tends to show BLM repeatedly said it would be glad to meet with the Tribe, but never did so.

/ / /

Although BLM invited the Tribe to attend public informational meetings about the project, the invitations do not appear to meet the requirements set forth in 36 C.F.R. § 800.2(c)(2)(ii).  This is particularly true because the Tribe first requested a more private, closed meeting between BLM and its tribal council.  In later communications, the Tribe continued to request that BLM meet with its tribal council on the Tribe's reservation.  In addition, the Tribe repeatedly complained that the properties hadn't been identified, and asked for a map showing where the identified sites were, requests that apparently went unanswered at least as late as June, 2010.  The Tribe's letter of August 4, 2010 apparently acknowledges receipt of maps, but asks for an extension of the deadline so it could review them before responding.

The documentary evidence also confirms the Tribe's contention that the number of identified sites continued to fluctuate.  Compare, *e.g.*, PI 008155 (BLM letter dated June 24, 2010 setting number of cultural sites in the project area at 446) and PI 00993 (Final EIS, stating Class III inventory identified 459 cultural sites).  And Defendants have admitted the evaluation of sites eligible for inclusion in the National Register hasn't yet been completed.

BLM's invitation to "consult," then, amounted to little more than a general request for the Tribe to gather its own information about all sites within the area and disclose it at public meetings.  Because of the lack of information, it was impossible for the Tribe to have been consulted meaningful as required in applicable regulations.  The documentary evidence also discloses almost no "government-to-government" consultation.  While public informational meetings, consultations with individual tribal members, meetings with government staff or contracted investigators, and written updates are obviously a helpful and necessary part of the process, they don't amount to the type of "government-to-government" consultation contemplated by the regulations.  This is particularly true because the Tribe's government's requests for information and meetings were frequently rebuffed or responses were extremely delayed as BLM-imposed deadlines loomed or passed.

No letters from the BLM ever initiate government-to-government contact between the Tribe and the United States or its designated representatives, the BLM field managers

Margaret Goodro, Vicki Wood, or acting field manager Daniel Steward.  Rather, the Tribe was invited to attend public informational meetings or to consult with two members of her staff, an archaeologist and a person identified only as a "point of contact."  The BLM in fact rebuffed the Tribe's August 4 request that the BLM meet with the tribal council on its reservation, proposing instead that the tribal council call BLM staff.

The Tribe also repeatedly protested it was not being given enough time or information to consider the Programmatic Agreement, a matter it was also entitled to be consulted about. The letters sent to the Tribe's president make clear BLM had determined a programmatic agreement would be used and would be entered into no later than September, 2010.  The Tribe's letter of February 4, 2010 suggests the Tribe had discovered on its own that BLM was already drafting the Programmatic Agreement.  Furthermore, BLM insisted that consulting parties send their suggestions in writing.  The Tribe's requests to consult about the Programmatic Agreement were obviously not granted.

Defendants have emphasized the size, complexity, and expense of this project, as well as the time limits, and the facts are sympathetic.  Tessera hoped to qualify for stimulus funds under the American Recovery and Reinvestment Act of 2009 by beginning construction no later than the end of this year, which is about two weeks away.  To that end, BLM apparently imposed deadlines of its own choosing.  Section 106's consulting requirements can be onerous, and would have been particularly so here.  Because of the large number of consulting parties (including several tribes), the logistics and expense of consulting would have been incredibly difficult.  None of this analysis is meant to suggest federal agencies must acquiesce to every tribal request.

That said, government agencies are not free to glide over requirements imposed by Congressionally-approved statues and duly adopted regulations.  The required consultation must at least meet the standards set forth in 36 C.F.R. § 800.2(c)(2)(ii), and should begin early.  The Tribe was entitled to be provided with adequate information and time, consistent with its status as a government that is entitled to be consulted.  The Tribe's consulting rights should have been respected.  It is clear that did not happen here.

The Court therefore determines the Tribe is likely to prevail at least on its claim that it was not adequately consulted as required under NHPA before the project was approved,. Because the project was approved "without observance of procedure required by law," the Tribe is entitled to have the BLM's actions set aside under 5 U.S.C. § 706(2)(D).

**Merits Analysis of Other Claims**

The evidence shows, and the parties do not dispute, that the planned project is extensive. The size and number of sun-catchers, not to mention roads, buildings, and other supporting infrastructure, ensures this will be a massive project. The undisputed evidence also shows the 459 historic properties extend from one end of the area to the other, so some type of impact on the properties is likely. In fact, phase 1 of the plan acknowledges that one such property will be adversely impacted; because of the property's size, power lines cannot span it, and one power pole must be installed on the property.

The Court therefore holds the FLPMA claim at least raises "serious questions" for purposes of injunctive relief.

The substance of the NEPA claim is less clear. Extensive environmental review has been conducted, so the chance that this project will harm the flat-tailed horned lizard appears to be reduced. At the same time, the Tribe was entitled to be consulted under NEPA as under NHPA, and its claims in this respect also raise "serious questions."

**Remaining Injunctive Relief Analysis**

Having determined that the Tribe is likely to succeed on the merits, at least as to its claim that required NHPA consulting must be completed before phase 1 of the project begins, the Court turns to the remaining *Winter* factors.

**Irreparable Harm**

To obtain preliminary injunctive relief, the Tribe must show it is likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 129 S.Ct. at 374. *Winter* emphasizes that the mere possibility of irreparable harm isn't enough; such harm must be likely. *Id*. at 375–76. This is the easiest and most straightforward part of the inquiry, because the Court finds it is very likely the Tribe will suffer irreparable harm.

The parties agree there are hundreds of known historical sites on the land, and the Tribe attaches cultural and religious significance to many if not most of these.  Hundreds of these sites have been identified as prehistoric, and many contain human remains.  Damage to or destruction of any of them would constitute irreparable harm in some degree.  Second, if the tribe hasn't been adequately consulted and the project goes ahead anyway, this legally-protected procedural interest would effectively be lost.  *See Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D.Cal.2009) (finding that, due to the alleged NEPA violations, the plaintiff was "virtually certain to suffer irreparable procedural injury absent an injunction") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 & n.7 (1992)).

The briefing didn't focus extensively on the risk of specific damage, but the massive size of the project and the large number of historic properties and incomplete state of the evaluation virtually ensures some loss or damage.   The Tribe has pointed out that the project would not avoid most of the 459 sites.  (Reply to Opp'n, 9:22-24 (citing Defendants' declarations that only 4 of 73 sites in phase 1 and 39 of 203 sites in phase 2 would be avoided)).  And, as discussed, phase 1 would involve damage to at least one known site.

The Court therefore finds this key requirement is easily met, and turns to the remaining two *Winter* factors.

**Balance of Equities**

To obtain injunctive relief under *Winter*, the Tribe must establish the balance of equities tips in its favor.  129 S.Ct. at 374.  *Winter* also refers to this as the "balance of hardships" inquiry.

Here, Defendants held most of the power—including the power to control the timing of the project and the review process.  Their briefing mentions that as early as 2007 they notified the Tribe of interest in developing the area for solar power generation, and the project was being planned at least as early as January, 2008.  In February, 2008, BLM was put on notice it needed to consult with the Tribe.  BLM imposed requirements deadlines on consulting parties, including the Tribes.  For example, it determined unilaterally that a

programmatic agreement would be used, and would be adopted no later than September, 2010.  BLM set deadlines and determined the timing and format of meetings.  Defendants were therefore in the best position to work out scheduling problems, and the Tribe had almost no power in this respect.

The Ninth Circuit has emphasized that consultation with tribes must begin early, and that if consultation begins after other parties may have invested a great deal of time and money, the other parties may become entrenched and inflexible, and the government agency may be inclined to tolerate degradation it would otherwise have insisted be avoided. *Te-Moak Tribe*, 608 F.3d at 609.  This appears to be happening here.  While the Court is sympathetic to the problems Defendants face, the fact that they are now pressed for time and somewhat desperate after having invested a great deal of effort and money is a problem of their own making and does not weigh in their favor.

It bears considering, too, that two of the Defendants are Secretary of the Interior Salazar and BLM, who represent part of the United States government, and that Congress and the Department of the Interior created the requirements that Defendants are finding so onerous.  Congress and, to a lesser extent, the Department of the Interior could have made these consulting requirements less stringent, but they didn't.  Congress could also have exempted renewable energy projects such as this from the Section 106 review process, but didn't.  Congress could also extend ARRA project deadlines for this project but hasn't, though, it was conceded at argument, Congress still might do so.

The Court is mindful that Defendants face hardships as well.  For example, Imperial Valley Solar has already spent millions of dollars preparing this project, and faces difficulties obtaining investment and financing if the project is held up.  Even so, the Court finds the balance of equities tips heavily in the Tribe's favor.

**Public Interest**

The final step in the *Winter* analysis requires the Court to consider whether a preliminary injunction is in the public interest.  129 S.Ct. at 374.  Obviously there are many competing interests here.  The interests the Tribe urges the Court to consider involve historic

and cultural preservation, in this case of hundreds of prehistoric sites and other sites whose significance has yet to be completely evaluated.  The Tribe itself is a sovereign, and both it and its members have an interest in protecting their cultural patrimony.  The culture and history of the Tribe and its members are also part of the culture and history of the United States more generally.

The value of a renewal energy project of this magnitude to the public is also great. It provides the public with a significant amount of power while reducing pollution and dependence on fossil fuels.  As Defendants point out, it is a goal of the federal government and the state of California to promote the development of such projects.  Current federal policy as embodied in ARRA also favors the undertaking of projects of this time, as a way of creating jobs and stimulating the economy.

That being said, the Court looks to the statutes enacted by Congress rather than to its own analysis of desirable priorities in the first instance.  *See, e.g., Marshall v. Barlow's, Inc.*, 436 U.S. 307, 331 (1978) (refusing to question Congress' weighing of interests when enacting statute); *Salazar v. Buono*, 130 S.Ct. 1803, 1828 (2010) (Scalia, J., concurring in the judgment) ("Federal courts have no warrant to revisit [Congress' decision about what is in the public interest]—and to risk replacing the people's judgment with their own. . . ."). Here, in enacting NHPA Congress has adjudged the preservation of historic properties and the rights of Indian tribes to consultation to be in the public interest.  Congress could have, but didn't, include exemptions for renewable energy projects such as this one.  And, as pointed out, Congress could determine this particular project is in the public interest and sweep aside ARRA deadlines as well as requirements under NHPA, NEPA, and FLPMA to get it built.  But because Congress didn't do that, and instead made the determination that preservation of historical properties takes priority here, the Court must adopt the same view.

**Alternate Basis for Injunctive Relief**

As an alternative basis for the Court's decision, *Alliance for Wild Rockies*, 622 F.3d at1049–50 authorizes the granting of preliminary injunctive relief on a showing of "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff

1    . . ., assuming the other two elements of the *Winter* test are also met." The "likelihood of

2    irreparable harm" factor is required, and is particularly emphasized. *Id*. at 1052.

3            As noted, the procedural NEPA claim and the substantive claim under FLPMA raise

4    "serious questions going to the merits." For the reasons just discussed, the Court also finds

5    the hardship balance tips sharply towards the Tribe, and the other two *Winter* factors are

6    also met. The most important of these factors, the likelihood of irreparable harm, is the

7    clearest and most obvious. For these reasons, the Court holds either of these would also

8    serve as an adequate basis for the grant of preliminary injunctive relief.

9    **Conclusion and Order**

10           For these reasons, the Tribe's motion for preliminary injunctive relief is **GRANTED**.

11   No later than Friday, December 17, 2010, the Tribe shall lodge by email a proposed order

12   temporarily enjoining the project. *See* Electronic Case Filing Administrative Policies and

13   Procedures Manual for this District, § 2(h). The proposed order shall be in editable format

14   and Defendants shall be copied on the email.

15           **IT IS SO ORDERED**.

16   DATED:  December 15, 2010

17

18   **HONORABLE LARRY ALAN BURNS**
     United States District Judge

19

20

21

22

23

24

25

26

27

28